IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
CEDAR RAPIDS DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, ) | |
| ) | |
| Plaintiff, ) | No. 22-CR-0002-CJW |
| ) | |
| vs. ) | |
| ) | |
| AARON MCCREIGHT, ) | |
| ) | |
| Defendant. ) | |
| ) | |

**GOVERNMENT'S SENTENCING BRIEF**

**TABLE OF CONTENTS**

I.   BACKGROUND ................................................................................................. 1

II.  A TWO-LEVEL ENHANCEMENT FOR ABUSE OF TRUST
     APPLIES ........................................................................................................... 11

III. A TWO-LEVEL ENHANCMENT FOR SUPERVISING ANOTHER IN
     CRIMINAL ACTIVITY APPLIES ................................................................. 16

IV.  THE COURT SHOULD IMPOSE A FINE .................................................... 19

V.   THE COURT SHOULD ORDER RESTITUTION AS RECOMMENDED
     BY THE PSR .................................................................................................... 20

VI.  CONCLUSION ................................................................................................. 20

I.   BACKGROUND

The United States anticipates the uncontested portions of the PSR and evidence at the sentencing hearing will establish the following facts by a preponderance of the evidence. *See United States v. Mustafa*, 695 F.3d 860, 862 (8th Cir. 2012).

1

Go Cedar Rapids ("GoCR") was a nonprofit organization whose primary function was to promote Cedar Rapids, Iowa as a desirable place for business, travel, tourism, and events. (PSR ¶ 7; Ex. 7 at 2). GoCR was originally incorporated in 1982 as the "Cedar Rapids Area Convention and Visitors Bureau." (Ex. 7 at 1). The organization adopted the name "Go Cedar Rapids" in 2016. (Ex. 7 at 1).

GoCR planned and staged Newbo Evolve, a three-day music and cultural event held in Cedar Rapids in August 2018. (PSR ¶ 8). Newbo Evolve featured concerts by Maroon 5 and Kelly Clarkson, as well as other attractions. (PSR ¶ 8).

Defendant Aaron McCreight was the President and Chief Executive Officer ("CEO") of GoCR. (PSR ¶ 9). His responsibilities included overseeing the planning and staging of Newbo Evolve. (PSR ¶ 9). Defendant provided progress reports on Newbo Evolve to the GoCR Board of Directors and the GoCR Executive Committee at meetings throughout 2017 and 2018, which at times included budget and ticket sales information. (PSR ¶ 9). As President and CEO, defendant's responsibilities also included hiring, overseeing, and terminating GoCR staff. (Ex. 7 at 8).

Doug Hargrave was formerly the GoCR Board treasurer and later the vice chairman of the GoCR Board. (PSR ¶ 10). In July 2018, Hargrave became GoCR's full-time finance director. (PSR ¶ 10). His responsibilities included updating Newbo Evolve's budget. (PSR ¶ 10). Defendant supervised Hargrave. (PSR ¶ 10).

In December 2017, a bank located in Cedar Rapids, "the lending bank," extended a $1.5 million revolving line of credit to GoCR to fund Newbo Evolve.

(PSR ¶ 13). In its request for this initial loan, GoCR estimated it would sell 11,000 tickets for the Kelly Clarkson concert; 11,000 tickets for the Maroon 5 concert; and 4,000 three-day Newbo Evolve passes. (PSR ¶ 13). Defendant signed the $1.5 million promissory note for this loan in his capacity as President and CEO of GoCR. (PSR ¶ 13). The terms of the loan required GoCR to provide financial information, including ticket sales, upon the lending bank's request. (PSR ¶ 13).

On February 9, 2018, GoCR began selling Newbo Evolve tickets to the public through a ticket vendor. (PSR ¶ 14). Defendant and other GoCR employees received regular ticket sales updates from the ticket vending company. (PSR ¶ 14).

On April 2, 2018, Hargrave provided a Newbo Evolve budget to the lending bank projecting a $335,909.66 profit. (PSR ¶ 15). On April 11, 2018, defendant shared a budget package with the GoCR Board's Executive Committee that similarly projected Newbo Evolve would generate a profit of $335,909.66. (PSR ¶ 16). The minutes from this meeting stated that it was "[t]ime to start considering contingency plans to cut costs and increase income with additional sponsorship dollars." (PSR ¶ 16).

On May 14, 2018, defendant and Hargrave provided to the lending bank a Newbo Evolve budget projecting a profit of $3,193.66. (PSR ¶ 17). That day, in a meeting with the representatives from the lending bank, defendant falsely reported to the lending bank that 6,000 tickets had been sold for Maroon 5's performance and 2,500 tickets had been sold for Kelly Clarkson's performance. (PSR ¶ 17). In reality, as of May 14, 2018, approximately 4,715 tickets had been sold and/or

provided free of charge ("comped") to vendors and advertisers for Maroon 5's performance and approximately 1,834 tickets had been sold and comped for Kelly Clarkson's performance. (PSR ¶ 17).

On June 1, 2018, defendant and Hargrave provided to the lending bank a Newbo Evolve budget projecting a profit of $84,703.66. (PSR ¶ 19). However, sometime around June 11, 2018, Hargrave informed defendant and the GoCR Board Chair that Newbo Evolve's updated budget was projecting a loss of more than $1.1 million. (PSR ¶ 20). Despite the projected loss, on June 14, 2012, GoCR drew down or took an advance in the amount of $225,000 from the loan with the bank. (PSR ¶ 21). On or about June 15, 2018, the GoCR Board Chair directed defendant to find ways to cut Newbo Evolve's budget to reduce the newly projected $1.1 million loss to, at most, a loss of $250,000. (PSR ¶ 22).

On June 20, 2018, at a GoCR board meeting, defendant presented a Newbo Evolve budget projecting a loss of $644,846.34. (PSR ¶ 23). The GoCR Board was informed that "just under 6,500 total tickets" had been sold, "[t]he budget is very tight," and that Newbo Evolve would be "short at the end but there is nothing left to cut." (PSR ¶ 23). The Newbo Evolve budget projecting a $644,846.34 loss was not provided to the lending bank. (PSR ¶ 23).

As the Newbo Evolve event dates approached, GoCR did not have enough money to, among other things, pay Kelly Clarkson, pay production costs, or buy the alcohol that was to be sold at the concert venue. (PSR ¶ 24). Without additional funding, Newbo Evolve would have to be cancelled. (PSR ¶ 24). Defendant and

Hargrave sought additional financing from several new potential high-risk lenders or lenders of last resort. (PSR ¶ 23). These other potential lenders did not agree to loan the money needed to prevent Newbo Evolve's cancellation. (PSR ¶ 24).

After failing to secure new loans, defendant and Hargrave ultimately sought additional financing from the lending bank. (PSR ¶ 24). On or about July 15, 2018, defendant and Hargrave discussed the need to send a Newbo Evolve budget to the lending bank in support of GoCR's request to increase its loan amount from $1,500,000 to $1,750,000. (PSR ¶ 25). Defendant told Hargrave that they did not want to show the bank the projected Newbo Evolve loss because the bank would not loan GoCR any additional funds for Newbo Evolve. (PSR ¶ 25).

On July 16, 2018, at defendant's direction, Hargrave emailed a false and fraudulent "Newbo Evolve 2018 Budget" to the lending bank in support of GoCR's request for additional funds. (PSR ¶ 26; *United States v. Doug Hargrave*, No. 22-CR-001, Doc. 14 at 8, ¶ 13.O[1]). Defendant and Hargrave knew this false and fraudulent Newbo Evolve 2018 Budget falsely, fraudulently, and materially overstated Newbo Evolve's expected ticket sale revenues; falsely, fraudulently, and materially understated Newbo Evolve's expected expenses; and falsely, fraudulently, and materially overstated Newbo Evolve's expected profit to be $65,653.66. (PSR ¶ 26). Defendant also knew this false and fraudulent budget overstated expected sponsorship revenues. (PSR ¶ 26). At the time Hargrave

---

[1] The United States asks the Court to take judicial notice of Doug Hargrave's plea agreement, Doc. 14, *United States v. Doug Hargrave*, No. 22-CR-001.

emailed this budget to the lending bank, defendant and Hargrave believed Newbo Evolve was not going to make any profit and, instead, would lose a substantial amount of money. (PSR ¶ 26).

On July 16, 2018, in a meeting with representatives of the lending bank, defendant falsely represented to the lending bank that 9,000 tickets had been sold for Maroon 5's performance and 6,000 tickets had been sold for Kelly Clarkson's performance. (PSR ¶ 27). In fact, as of July 16, 2018, and as defendant well knew, approximately 5,651 tickets had been sold for Maroon 5's performance and approximately 2,081 tickets had been sold for Kelly Clarkson's performance. (PSR ¶ 27).

On July 18, 2018, at a GoCR Board meeting, defendant falsely represented to the GoCR Board that "[i]n the last week and a half ticket sales have spiked," and that 9,000 tickets had been sold for Maroon 5's performance and 6,000 tickets had been sold for Kelly Clarkson's performance. (PSR ¶ 28). But, as defendant well knew, ticket sales had not "spiked" in the period from July 1 through July 16, 2018. (PSR ¶ 28). Moreover, as of July 18, 2018, approximately 5,703 tickets had been sold for Maroon 5's performance and approximately 2,095 tickets had been sold for Kelly Clarkson's performance. (PSR ¶ 28). Defendant and Hargrave did not share with the GoCR Board the false and fraudulent Newbo Evolve 2018 Budget projecting a $65,653.66 profit that Hargrave had sent to the lending bank. (PSR ¶ 28).

On July 19, 2018, in reliance on the false and fraudulent representations about Newbo Evolve's budget, the lending bank approved a new and substituted loan of $1,750,000 from the lending bank. (PSR ¶ 29). The terms of the $1.75 million promissory note made clear that the new note replaced the original $1.5 million promissory note: "This Note replaces that certain Promissory Note dated December 15, 2017, in the amount of $1,500,000.00 between Borrower and Lender to mature August 15, 2018." (Ex. 3 at 2). As a consequence of the fact that GoCR already owed $1.5 million to the lending bank under the terms of the old loan, GoCR received $250,000 in additional loan funds from the bank. (PSR ¶ 29).

On July 31, 2018, defendant and Hargrave sought yet another increase in the loan amount from the lending bank for production costs, food and beverage costs, session talent, and petty cash. (PSR ¶ 30). In connection with and in support of this loan increase request, defendant and Hargrave made the false representation to the lending bank that the previously provided false and fraudulent Newbo Evolve 2018 Budget dated July 16, 2018, which projected a $65,653.66 profit, was still in effect with one change: the sponsorships revenue projection was $250,000 lower than the sponsorships projection in the budget previously provided to the bank. (PSR ¶ 30). In truth, as defendant and Hargrave well knew (1) Newbo Evolve was not going to receive $1,790,672.66 in Concert Sales Income as projected in the July 16, 2018, budget; (2) Newbo Evolve was going to spend more than $475,000 on Production Expense as projected in the July 16, 2018, budget; and (3) Newbo Evolve

7

was not going to lose only approximately $200,000, and instead was going to lose at least $640,000 and likely much more. (PSR ¶ 31).

On August 1, 2018, again in reliance on false and fraudulent representations about Newbo Evolve's budget, the lending bank approved a new and substituted loan of $2,200,000 from the lending bank. (PSR ¶ 32). The terms of the $2.2 million promissory note made clear that the new note replaced the previous $1.75 million promissory note: "This Note replaces that certain Promissory Note dated July 19, 2018, in the amount of $1,750,000.00 between Borrower and Lender to mature August 15, 2018." (Ex. 4 at 2). As a consequence of the fact that GoCR already owed $1.75 million to the lending bank under the terms of the previous loan, GoCR received $450,000 in additional loan funds from the lending bank. (PSR ¶ 32).

As a result of the fraud, Newbo Evolve took place as scheduled with Maroon 5 and Kelly Clarkson performing as planned in August 2018. (PSR ¶ 33). Ultimately, Newbo Evolve lost more than $2 million. (PSR ¶ 33). Consequently, GoCR was unable to repay much of its loan from the lending bank when the loan was due. (PSR ¶ 33).

In emails to the GoCR Board Chairman shortly after Newbo Evolve, Hargrave made several statements regarding misrepresentations to the lending bank. (PSR ¶ 34). On August 13, 2018, Hargrave stated "the decision was passed along that we did not want to show a loss as the fear was the bank would not extend us any additional funds." (PSR ¶ 34; Ex. 5 at 1). In an email from August 15, 2018, Hargrave admitted to sending the lending bank a Newbo Evolve budget projecting

8

an approximately $65,000 profit, which he attached to the email. (PSR ¶ 34; Ex. 5 at 3). In that same email, Hargrave stated that,

> in conversation with Aaron he said that we needed to make this look much better as the bank won't provide us with the funding needed to make Kelly[ Clarkson]'s final payment. The follow up conversation, on the phone, sticks out vividly to me as he said, "I hope these numbers are ok so you can still sleep at night."

(PSR ¶ 34; Ex. 5 at 3).

On August 20, 2018, in a meeting with the GoCR Board Chairman and the GoCR Board Treasurer, defendant falsely stated that he and Hargrave had shown the lending bank the Newbo Evolve budget projecting an approximately $644,000 loss. (PSR ¶ 35). Defendant stated that he told Hargrave to send the "same budget" and disclaimed any responsibility for the lending bank receiving a different budget than the GoCR Board, saying "not by me." (PSR ¶ 35). Defendant further stated he would have only presented actual ticket sales numbers to the GoCR Board and not projections as it "wouldn't have been good to 'project tickets to the board.'" (PSR ¶ 35). On August 20, 2018, after the meeting with the GoCR Board Chairman and the GoCR Board Treasurer, the GoCR Board terminated defendant's employment. (PSR ¶ 36). The letter informing defendant of his termination noted that the investigation into Newbo Evolve was ongoing and had revealed that defendant had presented false information to the GoCR Board and "possibly" the lending bank. (PSR ¶ 36).

After his termination by the GoCR Board, defendant sought employment with "Visit Dothan," the Dothan, Alabama Convention and Visitor's Bureau. (PSR ¶ 37). When asked what had happened with Newbo Evolve during the interview

9

process, defendant told the Visit Dothan hiring committee that he had relied on information from others, including ticket projections from third-party promoters and expense projections from his events director that were ultimately not correct. (PSR ¶ 37).

FBI agents interviewed defendant on September 12, 2021. (PSR ¶ 39). Defendant knowingly made false statements during this interview in violation of 18 U.S.C. § 1001. (PSR ¶ 39). Defendant blamed a promoter for providing incorrect ticket sales projections. (PSR ¶ 39). With respect to the discrepancy between the actual ticket sales and the ticket sales numbers that defendant had provided to the GoCR Board and the lending bank, defendant falsely suggested that perhaps the numbers were projections that were misinterpreted and falsely said that he didn't know why those numbers would have been presented as actuals. (PSR ¶ 39).

Due to the failure of Newbo Evolve, approximately 97 vendors that provided services for Newbo Evolve did not receive full payment. (PSR ¶ 40). The vendors lost approximately $800,000 as a result of the fraud. (PSR ¶ 40).

Left with "no cash reserves or meaningful physical assets," GoCR folded. (Ex. 6).

After receiving $757,768.75 from income that Newbo Evolve did produce, the lending bank lost $1,442,231.25 on GoCR's defaulted $2.2 million promissory note. (PSR ¶ 41).

## II. A TWO-LEVEL ENHANCMENT FOR ABUSE OF TRUST APPLIES

The Court should apply a two-level enhancement for abuse of trust under USSG §3B1.3 because defendant abused a position of private and public trust.[2] Defendant abused the trust of his employer, GoCR, a private nonprofit organization that performed a public function. His actions caused GoCR's closure. As explained below, because defendant's position within GoCR significantly facilitated the commission and concealment of the offense, the enhancement applies.

Section 3B1.3 of the Sentencing Guidelines instruct the Court to apply a two-level increase "[i]f the defendant abused a position of public or private trust . . . in a manner that significantly facilitated the commission or concealment of the offense."

> "Public or private trust" refers to a position of public or private trust characterized by professional or managerial discretion (i.e., substantial discretionary judgment that is ordinarily given considerable deference). Persons holding such positions ordinarily are subject to significantly less supervision than employees whose responsibilities are primarily non-discretionary in nature. For this adjustment to apply, the position of public or private trust must have contributed in some significant way to facilitating the commission or concealment of the offense (e.g., by making the detection of the offense or the defendant's responsibility for the offense more difficult). This adjustment, for example, applies in the case of an embezzlement of a client's funds by an attorney serving as a guardian, a bank executive's fraudulent loan scheme, or the criminal sexual abuse of a patient by a physician under the guise of an examination. This adjustment does not apply in the case of an embezzlement or theft by an ordinary bank teller or hotel clerk because such positions are not characterized by the above-described factors.

USSG §3B1.3, comment. (n. 1).

---

[2] The United States Probation Office scored this enhancement in the draft PSR, (Doc. 18 ¶ 47), but then deleted it from the final PSR, (Doc. 21 ¶ 47). As noted in the final PSR, the United States objected to its removal. (Doc. 21 ¶ 47).

"[T]he government must prove two elements by a preponderance of the evidence in order for the abuse of trust enhancement to apply: (1) defendant occupied a position of private [or public] trust, and (2) defendant used this position in a manner that significantly facilitated the commission or concealment of the offense." *United States v. Miell*, 661 F.3d 995, 998 (8th Cir. 2011). The application of this enhancement "is fact intensive because it turns on the precise relationship between the defendant and her victims and therefore cannot be decided on the basis of generalities." *Id.* (quoting *United States v. Jenkins*, 578 F.3d 745, 753 (8th Cir. 2009)).

Federal circuit courts of appeals have determined the abuse-of-trust enhancement applies to executives of nonprofit organizations that serve a public function. *See United States v. Madrid*, 610 F. App'x 359, 365, 389 (5th Cir. 2015) (per curiam) (affirming enhancement imposed on a defendant who was the CEO of nonprofit substance-abuse program and a member of the team overseeing a large federal grant to provide services to children with mental health problems); *United States v. Ojemen*, 465 F. App'x 69, 71 (2d Cir. 2012) (unpublished) (affirming by summary order application of abuse of trust enhancement to a nonprofit's controller who abused the organization's trust by stealing information about its donors and additionally cast the nonprofit "in an unfavorable light with possible adverse consequences for its operations"); *United States v. Cameron*, 86 F. App'x 183, 184, 191-92 (7th Cir. 2004) (unpublished) (finding that executive director of federally funded nonprofit occupied a position of trust with respect to the organization and its

12

Case 1:22-cr-00002-CJW-MAR    Document 28-1    Filed 02/09/23    Page 12 of 20

Board of Directors); *United States v. Buck*, 324 F.3d 786, 789, 792-95 (5th Cir. 2003) (finding that president and CEO of nonprofit development organization funded by federal grants who misapplied federal funds and submitted false documents abused a position of trust with respect to the victim–government); *United States v. Robinson*, 198 F.3d 973, 975, 977-978 (D.C. Cir. 2000) (affirming application of abuse of trust enhancement for a defendant who contracted with a public school system to fulfill its obligation to provide public education to students with special needs by running a school that was paid for with city funds, which the defendant then embezzled).

Here, defendant abused a position of private trust that he held with respect to GoCR. Defendant was GoCR's President and CEO, a position of substantial "professional and managerial discretion." *See* USSG §3B1.3, comment. (n.1). As the President, he "was the principal executive officer and registered agent of the Corporation" responsible for "generally supervis[ing] and control[ling] all of the business and affairs of the Corporation subject to the ultimate direction and control of the board of directors." (Ex. 7 at 7). Defendant had a fiduciary duty to act in the best interests of GoCR. Instead, he committed a fraud that shuttered the organization, which had existed since 1982. Defendant's only supervisor was the Board of Directors to whom he lied. Defendant's false representations regarding Newbo Evolve directly impacted the financial health of the organization. These representations were not questioned by the Board members because of his position and because they trusted defendant. Defendant's position significantly facilitated

13

his commission and concealment of the offense because the Board did not have access to many of the facts underlying his representations and, based on his position, was unlikely to request them.

In his objection to the application of this enhancement, defendant cited *United States v. Trice*, 245 F.3d 1041 (8th Cir. 2001) (per curiam). (Doc. 19 at 2-3). In *Trice*, the President of a housing nonprofit corporation falsely stated on forms sent to the United States Department of Housing and Urban Development for federal funding that he had never been convicted of a felony. 245 F.3d at 1042. The Eighth Circuit determined that the defendant was not in position of trust with the United States government, the entity to whom the false statements were made. *Id.* The court found the relationship between the defendant and the United States was no more than "an 'arm's length business relationship'" and declined to apply the enhancement. *Id.* (quoting *United States v. Garrison*, 133 F.3d 831, 837 (11th Cir. 1998)).

The *Trice* court only examined whether the defendant was in a position of trust with respect to the government–lender. *Trice* does not address and, consequently has no application to, the question of whether an executive who commits a fraud that directly impacts (indeed, destroys) his organization is in a position of trust with respect to that organization. The answer to that question is obviously yes.

The Seventh Circuit Court of Appeals directly addressed this issue and held that *Trice* was distinguishable. *Cameron*, 86 F. App'x at 191-92. In *Cameron*, the

14

defendant, a former executive director of a neighborhood non-profit organization, was convicted of misapplying federal funds. *Id.* at 184. The defendant argued the enhancement did not apply because the government was the victim of her crime, and she did not abuse a position of trust with respect to the government. *Id.* at 191. The court found that "[t]here [w]as no question that, as executive director of [the neighborhood nonprofit], Ms. Cameron was in a position of trust with respect to [the organization] and its Board of Directors." *Id.* at 192. Because she occupied a position of trust with respect to the organization and the organization "suffered as a result of" the defendant's actions, the enhancement of abuse of a position of trust applied. *Id.*

As in *Cameron*, defendant was undoubtedly in a position of trust with GoCR and its Board of Directors. There is also no question that GoCR suffered as a result of defendant's actions. Defendant's fraud caused the organization to cease all operations.

In addition, defendant abused a position of public trust with respect to the City of Cedar Rapids. The City of Cedar Rapids provided $500,000 to GoCR for the funding of Newbo Evolve. (Ex. 9 at 2). GoCR's sole purpose and stated mission was to promote and enhance Cedar Rapids:

> Our Mission: GO Cedar Rapids is dedicated to enhancing the local economy by promoting the Cedar Rapids area as the premier destination in the region for travel, tourism and events.
>
> Our Vision: GO Cedar Rapids is the destination's go-to organization for promotion, collaboration and innovation.

15

(Ex. 8 at 2). Defendant thus was the President and CEO of the City's tourism bureau. The City provided funding for Newbo Evolve trusting that defendant would be a faithful steward of those funds and put on an event that would showcase and benefit the City of Cedar Rapids. Instead, defendant's fraud bankrupted GoCR, leaving the City without the convention and visitors' bureau it had had since 1982.

The Court should find that defendant abused a position of private and public trust and apply the two-level enhancement under USSG §3B1.3.

### III. A TWO-LEVEL ENHANCMENT FOR SUPERVISING ANOTHER IN CRIMINAL ACTIVITY APPLIES

At paragraph 48 of the PSR, the United States Probation Office recommends a two-level upward adjustment based on defendant's role in the offense. Defendant objects to this enhancement, arguing that he and Hargrave worked together with equal authority in producing Newbo Evolve. (PSR ¶ 48). The Court should overrule defendant's objection.

Under USSG §3B1.1(c), a two-level enhancement applies if a defendant was an organizer, leader, manager, or supervisor in criminal activity. Thus, "when considering whether § 3B1.1(c) applies, it is unnecessary to determine whether the defendant was a mere 'manager or supervisor' or instead was a more responsible 'organizer or leader.'" *United States v. Jackson*, 639 F.3d 479, 483 (8th Cir. 2011). Nevertheless, the Eighth Circuit Court of Appeals has stated that application note 4, which gives guidance for distinguishing a leadership and organizational role from one of mere management or supervision, is helpful when determining if 3B1.1.(c) applies. *Id.* Application note 4 states:

16

> In distinguishing a leadership and organizational role from one of mere management or supervision, titles such as "kingpin" or "boss" are not controlling. Factors the court should consider include the exercise of decision making authority, the nature of participation in the commission of the offense, the recruitment of accomplices, the claimed right to a larger share of the fruits of the crime, the degree of participation in planning or organizing the offense, the nature and scope of the illegal activity, and the degree of control and authority exercised over others. There can, of course, be more than one person who qualifies as a leader or organizer of a criminal association or conspiracy. This adjustment does not apply to a defendant who merely suggests committing the offense.

USSG 3B1.1, comment. (n.4). The Eighth Circuit Court of Appeals has stated that, "[i]n applying these factors, we have recognized that "[t]he terms 'organizer,' 'leader,' 'manager,' and 'supervisor' are to be construed broadly." *United States v. Richart*, 662 F.3d 1037, 1045-46 (8th Cir. 2011) (alteration in original) (quoting *United States v. McDonald*, 521 F.3d 975, 978 (8th Cir. 2008)). "'A manager or supervisor need only have managed or supervised one other participant' in criminal activity, and 'the enhancement may apply even if the management activity was limited to a single transaction.'" *United States v. Adejumo*, 772 F.3d 513, 537-38 (8th Cir. 2014) (quoting *United States v. Zimmer*, 299 F.3d 710, 724 (8th Cir. 2002)).

A supervisor-employee relationship in which the supervisor instructs the employee to commit acts that form the basis for a crime may, as in the present case, be sufficient to support a role enhancement under USSG §3B1.1. *See United States v. Gardner*, 716 F. App'x 560, 564 (8th Cir. 2017) (per curiam) ("The record amply supports the district court's conclusion that Gardner directed at least one other participant, Hennessey CFO Jon Essen, in furtherance of the fraudulent scheme. Gardner was Essen's employer and supervisor. Essen prepared misleading letters to

17

investors and Gardner approved those letters."); *United States v. Hayes*, 574 F.3d 460, 467, 478 (8th Cir. 2009) (affirming role enhancement where supervisor directed employees to submit false time sheets); *United States v. Due*, 141 F.3d 1171, 1998 WL 105863, at *1 (8th Cir. 1998) (per curiam) (unpublished) (affirming role enhancement where part owner and vice president supervised line-level employees in illegal burying of waste); *United States v. Braun*, 60 F.3d 451, 453 (8th Cir. 1995) (affirming supervisor's role enhancement where employees aided in the commission of the offenses and supervisor would have been unable to carry out his fraudulent scheme).

Contrary to defendant's assertions in his objection to this enhancement, he and Hargrave were not on an equal footing. Defendant, as Hargrave's supervisor and the President and CEO of GoCR, had the power to fire Hargrave. (Ex. 7 at 8). Defendant did not object in the PSR to the fact that he supervised Hargrave and Hargrave reported to him. (PSR ¶ 10). Hargrave stipulated that he sent the false budget to the lending bank at defendant's direction. *United States v. Doug Hargrave*, No. 22-CR-001, Doc. 14 at 8, ¶ 13.O.

Looking at the nature of defendant's participation in the offense, defendant was the first to report false information to the lending bank. (PSR ¶ 17). He went on to make similar false reports of inflated ticket numbers to the bank on a later date and then he repeated those same false numbers to the GoCR Board. (PSR ¶¶ 27-28). According to an email from Hargrave to the GoCR Board Chair sent eight days after Newbo Evolve, defendant and Hargrave had a conversation before Hargrave sent the false budget to the bank. (Ex. 5 at 3). From that conversation, Hargrave understood that he needed to falsify the numbers in the budget that he

18

was going to send the bank. (Ex. 5 at 3). While defendant denies the statements that Hargrave attributes to him in the email, (*see* Objection to PSR ¶ 34), Hargrave's statements are close in time to the event and credible. In telling Hargrave that they needed to make the numbers look better for the bank before Hargrave sent the false budget, defendant was ensuring that Hargrave would continue the scheme to defraud that defendant had already begun by reporting false ticket numbers to the bank. Moreover, Hargrave did not have access to the ticket numbers or the sponsorship projections and would have had to base actual or false numbers on information from defendant.

Defendant supervised Hargrave in criminal activity and should receive a two-level enhancement to reflect his role within the scheme to defraud.

## IV. THE COURT SHOULD IMPOSE A FINE

"The district court has statutory authority to impose a fine, 18 U.S.C. § 3571, and the sentencing guidelines recommend imposition of a fine in all cases, unless the defendant establishes that he is unable to pay and is not likely to become able to pay a fine." *United States v. Morais*, 670 F.3d 889, 893 (8th Cir. 2012); *see* USSG §5E1.2(a).

Defendant has a positive net worth and a positive monthly cash flow. (PSR ¶ 80). He has not carried his burden to show that he is unable to pay a fine. The Court should impose a reasonable fine to reflect the seriousness of the offense, promote respect for the law, provide just punishment, and afford adequate deterrence. *See* 18 U.S.C. § 3553(a)(2); USSG §5E1.2(d)(1). The United States

19

Case 1:22-cr-00002-CJW-MAR  Document 28-1  Filed 02/09/23  Page 19 of 20

recognizes that any restitution obligation could impact defendant's ability to pay a fine. *See* USSG §5E1.2(d)(4).

## V. THE COURT SHOULD ORDER RESTITUTION AS RECOMMENDED BY THE PSR

The United States Probation Office recommends that defendant be ordered to pay $1,442,231.25 in restitution joint and severally with Doug Hargrave. (PSR ¶ 99; *see also* Ex. 1). Defendant does not object to this paragraph in the PSR. The Court should order restitution as recommended in the PSR.

## VI. CONCLUSION

The Court should (1) impose a two-level enhancement because defendant 's offense involved the abuse of a position of trust; (2) impose a two-level enhancement because defendant was a supervisor and leader in criminal activity; (3) impose a fine; and (4) order restitution as recommended in the PSR.

Respectfully submitted,

TIMOTHY T. DUAX
United States Attorney

By: */s/ Kyndra Lundquist*

KYNDRA LUNDQUIST
Assistant United States Attorney
111 7th Avenue SE, Box 1
Cedar Rapids, IA 52401-2101
319-363-6333
319-363-1990 – Fax
Kyndra.Lundquist@usdoj.gov

CERTIFICATE OF SERVICE
I hereby certify that on February 9, 2023, I electronically filed the foregoing with the Clerk of Court using the ECF system which will send notification of such filing to the parties or attorneys of record.
UNITED STATES ATTORNEY
BY: /s/ KAL_____

20

Case 1:22-cr-00002-CJW-MAR   Document 28-1   Filed 02/09/23   Page 20 of 20